# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**MARIKA MARIS,**

    **Plaintiff,**

                                **Case No.:**

    **vs.**

**BAY HOSPITAL, INC. d/b/a**
**Gulf Coast Regional Medical**
**Center, HCA Inc.**

    **Defendant.**

_____

## COMPLAINT

## DEMAND FOR JURY TRIAL

**COMES NOW**, the Plaintiff, Marika Maris, by and through her undersigned counsel, brings this lawsuit seeking declaratory relief, injunctive relief and monetary damages against Defendant, Bay Hospital, Inc. d/b/a Gulf Coast Regional Medical Center ("Gulf Coast") and HCA Inc. ("HCA") for violations of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Section 1557 of the Patient Protection and Affordable Care Act ("Affordable Care Act"). Defendants failed to provide effective communication, and meaningful access for the deaf Plaintiff when she sought medical care  nineteen (19) times from 2017 to present, when seeking treatment for herself and her minor

1

son. Defendants intentionally denied Plaintiff full and equal enjoyment of Defendants' services, facilities, and privileges. Defendants failed to make reasonable modifications in policies, practices or procedures, and failed to take such steps as are necessary to ensure the Plaintiff was not excluded, denied services, or otherwise treated differently because of her disabilities.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the actions pursuant to 28 U.S.C. § 1331, 1343.

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1)-(b)(2) because 1.) the Defendants are located in this district, and 2.) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

## PARTIES

## PLAINTIFF

3.     Plaintiff, MARIKA MARIS ("Ms. Maris"), is and was, at all times material hereto, a resident of Bay County, Florida. Ms. Maris is deaf, and she relies upon American Sign Language ("ASL") to communicate effectively.

## DEFENDANT

4.     Defendant, BAY HOSPITAL, INC. d/b/a Gulf Coast Regional Medical Center ("Gulf Coast") is located in Panama City, Florida, and  is a place

2

of public accommodation pursuant to 42 U.S.C. §12181 (7) (F), and is subject to the mandates of Title III of the ADA and its implementing regulations.

5.      Defendant HCA INC., ("HCA") is the parent corporation of Gulf Coast Regional Medical Center, and is located in Nashville, Tennessee. HCA is a place of public accommodation pursuant to 42 U.S.C. §12181 (7) (F), and is subject to the mandates of Title III of the ADA and its implementing regulations.

6.      Gulf Coast and HCA are recipients of federal financial assistance and are, therefore, subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

7.      Defendants are principally engaged in the business of providing health care and are, therefore, subject to Section 1557 of the Patient Protection and Affordable Care Act, 29 U.S.C. § 705(20) and 42 U.S.C. § 12102. *See* 42 U.S.C. § 18116; 45 C.F.R. § 92.4, and its implementing regulations.

## FACTUAL ALLEGATIONS

8.      Ms. Maris was born deaf, and relies upon American Sign Language ("ASL") to communicate effectively in a bi-directional manner. Ms. Maris can speak to some degree, but often her voice is not understood by others, which is both frustrating and embarrassing. She cannot lip-read well enough to communicate without an interpreter.

9.     When Ms. Maris receives medical treatment for herself, or her minor son she requests an ASL interpreter. In order to engage in an interactive exchange of medical information, Ms. Maris requires a qualified ASL interpreter.

10.     Ms. Maris has significant health issues requiring medical attention to include: cardiac problems, physical problems related to anxiety, chronic sinus infections, seizures, ongoing infections with a cochlear implant that had been removed and a second one that is inoperable, and syncope episodes.

11.     Ms. Maris is now a single mother with a minor son, WMB who is four (4) years old.

12.     On August 14, 2017, Ms. Maris made a report to the Department of Children and Families ("DCF") about suspected child abuse by her ex-husband. As a result, a DCF investigation began, and Ms. Maris was required to comply with DCF directives and have WMB undergo a series of medical examinations when directed by DCF and or medical professionals.

13.     Ms. Maris was very concerned for her son who had bruising on his leg, and was believed to be shaken by his father. She was also concerned any noncompliance to DCF's demands could result in WMB being removed from her custody.

14.     Ms. Maris immediately took WMB to see his primary care doctor for an examination related to the allegations of child abuse. The primary care doctor

directed her to take WMB to Gulf Coast Regional Medical Center ("Gulf Coast") for a full body scan.

15.    <u>First Visit to Gulf Coast</u>: On approximately August 17, 2017, Ms. Maris's brought WMB, now two (2) years old, to the emergency room ("ER") for a body scan. Upon her arrival, as she always does when seeking medical care, Ms. Maris requested an ASL interpreter. At first, Gulf Coast said an interpreter would be provided, but they failed to provide an interpreter.

16.    The staff treating Ms. Maris noted in the child's medical records the mother has "profoundly (sic) deafness."

17.    After waiting, Ms. Maris was finally approached by a nurse, and was told an interpreter would not be provided. In response, she told the staff she must have an interpreter to understand her son's treatment. The request was denied.

18.    Medical staff began to examine WMB, and Ms. Maris, again, requested an interpreter. This time, she was told an interpreter would be provided, but not until after the child's x-rays were completed.

19.    After WMB's x-rays were complete, Gulf Coast attempted to provide an interpreter through Video Remote Interpreting ("VRI"). VRI is a service which allows for the sign language interpreter to appear remotely through a computer. The VRI equipment used at Gulf Coast consisted of a small iPad, with a small screen, attached to a cart on wheels.

20.     The VRI did not work, and the image of the interpreter continued to freeze, and black out. The staff, including the doctor, could see the device did not work. Gulf Coast then abandoned the VRI device because it did not work.

21.     Instead of providing *primary consideration* to her request for an ASL interpreter, as is required by law, Ms. Maris was forced to attempt to type messages back and forth with the doctor through his cell phone. This humiliating and demeaning approach failed to provide Ms. Maris effective communication because she was not able to understand the medical treatment, nor was she able to ask questions about injuries to her son.

22.     Frustrated and scared for her son, Ms. Maris used her cell phone to pull up the names of ASL interpreters in the area that could be called to come interpret. Ms. Maris showed these names and telephone numbers to Gulf Coast, but Gulf Coast continued to refuse to provide an interpreter.

23.     The full body scan was never performed, and Ms. Maris did not understand why. She was very concerned because she was directed, specifically, by her doctor to get the body scan due to the allegations of the baby being shaken. In the four (4) hours she was there with her son, Gulf Coast failed to provide effective communication by way of an onsite interpreter, or other accommodation.

24.     <u>Second Visit to Gulf Coast</u>: After Ms. Maris failed to get the full body scan, DCF directed her to return to Gulf Coast on August 30, 2017, to have a CAT

scan performed on WMB. This time, Ms. Maris was accompanied by a deaf friend, Amanda Hendrix.

25.     Upon arrival, Ms. Maris and her friend requested an ASL interpreter, but the request was denied. The medical records confirm the hospital was unable to provide an exchange of medical information by documenting, "mom is confused where scan is to be done." But Ms. Maris was not confused about the scan, the confusion stemmed from the inability of Gulf Coast to effectively communicate with the Plaintiff.

26.     Gulf Coast asked Ms. Maris's deaf friend if she could interpret, but Ms. Hendrix explained she too had a hearing loss, and is not a qualified interpreter. With no other choice, Ms. Hendrix attempted to interpret, but it was too difficult because she was trying to lip-read Gulf Coast staff and then sign for Ms. Maris. Many of the employees were talking too fast, not looking at her, and or wearing face masks.

27.     Gulf Coast admits in the medical records they are unable to communicate with Ms. Maris by documenting "[n]eed for follow up (with DCF), [w]hen to return to ED, made contact with [DCF] and mom is to f/u when [DCF] is able to locate a rep that will be able to communicate with deaf client, no imaging today."

28.     Ms. Maris and her son were denied medical treatment, because the hospital failed to provide effective communication to discuss the basis for the scan.

29.     Third Visit to Gulf Coast: On December 18, 2017, Ms. Maris brought two (2) year old WMB to Gulf Coast ER because he was coughing and had a fever. Although Ms. Maris requested an interpreter, Gulf Coast failed to provide an interpreter for the treatment.

30.     Fourth Visit to Gulf Coast: Ms. Maris sought treatment at the ER on January 3, 2018, for heart palpitations, weakness, vomiting, and coughing. During this trip, she was accompanied by her father, Nick Maris.

31.     Once they arrived, Ms. Maris and her father requested an interpreter, but the request was denied. In an effort to obtain an interpreter, Ms. Maris and her father shared the names of local ASL interpreter referral agencies that can be called to secure an interpreter, but Gulf Coast refused to secure an interpreter.

32.     In lieu of giving *primary consideration* to Ms. Maris's request for an ASL interpreter, the staff forced her to attempt to communicate by gesturing and typing on a cell phone. This was not effective, and it was degrading.

33.     Seeing his daughter in distress, and unable to exchange her medical information, Ms. Maris's father, Nick Maris, attempted to interpret for her, but it was not effective.

34.    Nick Maris knows some very basic sign language, but signs extremely slow, and often his signs are not comprehensible. Nick Maris does not have the skills or the training to "sign" medical information, or explain medical advice. By his own admission, his sign language skills are poor at best, and told Gulf Coast the same each time he accompanies his daughter.[1]

35.    As a result of Mr. Maris's poor signing skills, the communication breaks down, and Gulf Coast began communicating directly with Ms. Maris's father instead of Ms. Maris. This results in Ms. Maris being relegated to a bystander in her own medical treatment.

36.    Ms. Maris and her father repeat their requests for an interpreter, to the doctors and the nurses, and their requests are continually denied. Augmenting the fact she is missing all the medical information and exchange, is her constant concern an MRI will be performed on her, and expose her to physical harm from the MRI.[2]

37.    Ms. Maris underwent a series of tests to include a CT of her head and brain, chest x-rays, and blood work. Gulf Coast documents the inability to

---

[1] The fact that Ms. Maris's parents cannot sign well is common, because ninety percent of all deaf children have parents who are not deaf. *Found at* https://www.nidcd.nih.gov/health/statistics/quick-statistics-hearing.   (last visited April 23, 2020).

[2] Due to the age of the inoperable cochlear implant still implanted in her head, Ms. Maris cannot be exposed to an MRI. *See* www.hopkinsmedicine.org/otolaryngology/specialty_areas/listencenter/resources/mris-at-hopkins.html. (last visited April 24, 2020).

exchange medical information with Ms. Maris by noting in her records, "Barriers to communicate/learning: Impaired hearing."

38.   <u>Fifth Visit to Gulf Coast</u>: On January 6, 2018, Ms. Maris took her two (2) year old son, WMB to the ER for an ear ache. Upon arrival, Ms. Maris requested an interpreter, and again, Gulf Coast failed to provide an interpreter. She was accompanied by her mother Despo Maris, who also requested an interpreter.

39.   WMB was not feeling well, and was very fussy. It was extremely difficult to try to tend to the baby, at the same time Ms. Maris was struggling to communicate with Gulf Coast staff. Gulf Coast asked Ms. Maris's mother to interpret, but that was not effective.

40.   Despo Maris's first languages are Greek and Arabic, and she is a very poor signer. Despo Maris does not know many signs, and cannot relay medical information to her daughter. Despo Maris told Gulf Coast she is not a qualified interpreter, and although her daughter is deaf, it does not mean she is a qualified interpreter, but Gulf Coast continued to refuse to secure an interpreter.

41.   <u>Sixth Visit to Gulf Coast</u>: On January 28, 2018, Ms. Maris, and her mother, took WMB, now two (2) years old, to the ER because he had a high fever again, and a swollen and sore throat.

42.   Ms. Maris and her mother requested an ASL interpreter, but the request was denied. The child was diagnosed with tonsillitis and provided

antibiotics. Ms. Maris was concerned because the child had already been prescribed antibiotics, but he kept getting a fever and becoming ill, and she wanted to ask more questions.[3] Due to the absence of an interpreter, she was unable to have all her questions answered.

43.     <u>Seventh Visit to Gulf Coast</u>: Ms. Maris returned to Gulf Coast's ER on May 14, 2018, for chest pains, a head ache, eyelid twitching, and an anxiety attack. She was accompanied by her deaf friend, Amanda Hendrix.

44.     Both Ms. Hendrix and Ms. Maris requested an interpreter, and the request was denied. Ms. Hendrix told Gulf Coast she has the names of some interpreters that can be called to interpret, but the staff was evasive, saying something to the effect of there is no time, or we are not sure someone will come. Ms. Hendrix told them to try, that way they will know for sure, but an interpreter was never provided.

45.     In lieu of providing an interpreter for the deaf patient, and the deaf companion as required by law, Ms. Hendrix was forced to attempt to interpret for Ms. Maris. This was not effective, because Ms. Hendrix could not interpret the

In April of 2018, Ms. Maris received a letter from WMB's pediatrician advising her they would no longer treat her son, and she needed to find other care for him. She later found out the doctor told the ASL interpreter service, he did want to have to pay for interpreters anymore. It was becoming more difficult for Ms. Maris to find a provider who would care for her son, and provide an ASL interpreter for her.

complex medical terms used, and due to her hearing loss, she was unable to hear everything that was being said.

46.    Ms. Maris underwent several procedures to include an EKG, chest x-ray, CT of her head/brain, and blood work. Gulf Coast documents in the medical records, Ms. Maris is "severely hearing impaired and has a friend here translating" and she is "profoundly deaf from birth." The failure to provide an interpreter denied Ms. Maris the ability to participate in her medical care.

47.    In May of 2018, WMB was being seen by a physician for chronic tonsillitis. Ms. Maris was told WMB would require surgery to remove his tonsils and adenoids, and the surgery would be performed at Gulf Coast.

48.    Ms. Maris was adamant with the physician, telling him she is tired of not getting interpreters at Gulf Coast, and said she would not consent to the surgery scheduled for May 17, 2018, unless ASL interpreters would be provided.

49.    Ms. Maris was assured ASL interpreters would be provided for her son's surgery so she could understand the medical treatment, and have all of her questions answered. Due to the child's age, Ms. Maris was told WMB would be required to stay overnight.

50.    On approximately May 16, 2018, Gulf Coast called Ms. Maris to confirm the surgery time, and other last minute surgical related items. During that call, Ms. Maris asked Gulf Coast to confirm onsite interpreters would be provided

due to the problems with VRI. Gulf Coast told Ms. Maris they would provide ASL interpreters.

51.     Eighth Visit to Gulf Coast: On May 17, 2018, Ms. Maris went to Gulf Coast for the scheduled outpatient surgery for WMB, now two (2) years old, to have his tonsils and adenoids removed. Ms. Maris was accompanied by her mother, Despo Maris.

52.     Miraculously, Gulf Coast secured onsite ASL interpreters for the first day. But WMB was scheduled to stay overnight for observation, and Gulf Coast failed to secure interpreters for the second day. This left Ms. Maris without an interpreter for the discharge information, along with discussions with the surgeon and medical staff.

53.     As a result, her mother was forced to try to interpret for Ms. Maris. Ms. Maris's mother does not sign well, and could not interpret the information.

54.     Ninth Visit to Gulf Coast: On approximately August 15, 2018, WMB, now three (3) years old, was seen by a Gulf Coast pediatrician due to a penile nevus. Although requested, no interpreter was provided for Ms. Maris. The physician forced her to write back and forth to communicate, which was not effective.

55.      Ms. Maris was told a biopsy was required on the child's penis to determine if it was cancer, and the procedure would be performed at Gulf Coast.

Ms. Maris wanted to make sure interpreters would be provided for the surgery, in case she was told it was cancer or appeared to be cancer, and needed to be able to communicate. She was also very worried about the child's potential pain level. The pediatrician assured interpreters would be provided.

56.     <u>Tenth Visit to Gulf Coast</u>: On approximately August 27, 2018, Ms. Maris had to bring WMB into the hospital for a preoperative appointment with the anesthesiologist, and was again, denied an ASL interpreter.

57.     On August 27, 2018, Gulf Coast called to confirm the final details of the surgery, and Ms. Maris asked Gulf Coast to confirm onsite interpreters would be provided due to the inoperability of the VRI. Ms. Maris was told ASL interpreters would be provided.

58.     <u>Eleventh Visit to Gulf Coast</u>: On August 28, 2018, Ms. Maris, her mother, and her son, now three (3) years old, arrived at Gulf Coast for the surgery. Although Gulf Coast told Ms. Maris ASL interpreters would be provided, they were not.

59.     Ms. Maris arrived at approximately 6:30 a.m. as instructed. Gulf Coast attempted to use VRI, but again it did not work. Ms. Maris and her mother watched as the staff floundered around trying to get the VRI to work, it did not— and valuable time was passing before WMB's surgery time. Due to the child's

history of allergic reaction to anesthesia, Ms. Maris wanted to talk clearly with the surgical team before WMB was put under anesthesia.

60.     The fact that the device was not working was obvious to everyone in the room, to include the VRI interpreter who appeared on the screen. The VRI interpreter told Gulf Coast the VRI screen was "blacked out", and they needed to secure an onsite interpreter. Mrs. Despo Maris, who can hear, heard the exchange between the VRI interpreter and Gulf Coast staff. The VRI interpreter told Gulf Coast she could not provide interpreting services because she could not see Ms. Maris.

61.     The ill trained staff continued to haphazardly stare at the VRI machine and continued to waste time, as Ms. Maris became more anxious to talk with the medical staff before WMB was put under anesthesia.

62.     As a result of the inoperative VRI, Gulf Coast abandoned the device, and told Ms. Maris an onsite interpreter would be provided, and would arrive in thirty (30) minutes. For the approximate four (4) hours Ms. Maris and her son were there, Gulf Coast failed to provide an interpreter.

63.     Before WMB went into surgery, Ms. Maris frantically used Facebook Messenger to contact a local ASL interpreter referral agency, and told them Gulf Coast is refusing to provide an onsite interpreter, and the VRI was not working, again.

64.     Ms. Maris and the interpreter agency began an exchange about how to correct the situation. Ms. Maris's mother then placed a call to the interpreter agency to try to find out how they could get help to get an interpreter, because the staff at Gulf Coast was ignoring their pleas for an interpreter.

65.     Still, prior to WMB going into surgery, the interpreter agency told Ms. Maris that Dave Coughlin is the Risk Manager at Gulf Coast, and Ms. Maris needed to tell the Gulf Coast staff to call Mr. Coughlin so Ms. Maris could get an interpreter.

66.     Ms. Maris and her mother provided Dave Coughlin's contact information to the Gulf Coast staff. But the staff told Ms. Maris and her mother, Mr. Coughlin was called, but there was "no answer."

67.     Regardless of the fact, Ms. Maris asked for an interpreter at her pre-op appointments, spoke to Gulf Coast the day before surgery, asked for an interpreter when she arrived, and provided the name of the person reported to be the risk manager for the hospital, Gulf Coast still failed to secure an interpreter. This denial dovetails Gulf Coast's ongoing knowledge that the VRI device does not work, and after, they just abandoned the device knowing it does not work.

68.     Ms. Maris was now stuck writing back and forth with medical staff, which does not provide her an effective way to exchange medical information. Ms. Maris was very upset, and felt powerless because there appeared to be no way to

get Gulf Coast to respect her rights as a deaf person, and as a mother to have an interactive exchange about health care decisions for her son.

69.     Their blatant exclusion and disrespect is outrageous to Ms. Maris and her mother. Ms. Maris's three (3) year old child was about to be put under anesthesia and have biopsy on a potentially cancerous mole on his penis. Ms. Maris felt completely defeated and disregarded. As a result, Despo Maris was forced to try to interpret for Ms. Maris, and again this was not effective.

70.     Ms. Maris was also distressed because she saw her mother, Despo Maris upset. All of this avoidable stress and exclusion was created because Gulf Coast failed to perform the menial task of picking up a phone, and securing an onsite ASL interpreter.

71.     When Ms. Maris left, she was told the results of the biopsy would be shared with her when she met with the surgeon the next week. It was a harrowing week, and they renewed a request to have an interpreter for the biopsy results.

72.     <u>Twelfth Visit to Gulf Coast</u>: Approximately one week after the surgery, Ms. Maris returned to the surgeon's office, with her deaf ex-husband, at Gulf Coast for a follow up visit to learn the results of the biopsy. Gulf Coast, again, failed to provide an interpreter.

73.     Ms. Maris and her deaf ex-husband tried to assist each other to understand what the doctor was saying. Ms. Maris was thankful to learn the mole

was benign, but was unable to ask more questions about what caused the mole, if it would return, and other critical questions due to the failure of not having an interpreter.

74.     <u>Thirteenth Visit to Gulf Coast</u>: On October 1, 2018, Ms. Maris returned to Gulf Coast ER, because her son was running a fever of 104°, and had a bad cough. The family recently returned from a two (2) week trip out of the country, and WMB was whining and not well. Ms. Maris was concerned the child was exposed to something while travelling.

75.     Due to Ms. Maris's experience with Gulf Coast refusing to secure an ASL interpreter, her mother went with her, and they were later joined by her deaf ex-husband.

76.     Ms. Maris, her deaf ex-husband, and her mother requested an ASL interpreter, and, as usual, the requests were denied. Gulf Coast wheeled in the infamously inoperable VRI, and, once again, it did not work. The screen was blacking out, and could not maintain a connection, so Gulf Coast abandoned the device.

77.     In lieu of giving *primary consideration* to Ms. Maris's request for an ASL interpreter, the staff attempted to communicate by way of hand written notes. Writing was not effective, not only because it did not provide an exchange of

medical information, but there were two (2) deaf people in the room. Additionally, WMB was whining and requiring Ms. Maris's attention.

78.    Due to the child's travel out of the country, there was a discussion about viruses and other infections which Ms. Maris had never heard of before. Ms. Maris became very concerned, and, as a result of Gulf Coast failure to secure an interpreter, her mother was forced to interpret.

79.    Her mother, by her own admission to the staff, missed large portions of the medical information because she does not know how to sign the medical information. The situation was even more challenging for Despo Maris, due to the fact that questions were also being asked by Ms. Maris's deaf ex-husband, and she was trying to interpret for two (2) deaf people.

80.    The treating nurse was rough with WMB, and told the family a blood and urine sample was needed. Ms. Maris tried to explain that if the nurse would please slow down, they could work together to get the samples because WMB has had samples taken before, and Ms. Maris was able work with her own child to get what was needed.

81.    Instead, the child was restrained with a sheet by two (2) nurses, and the nurse attempted to insert a catheter in WMB. His screams were so loud, they could be heard by Ms. Maris's father and sister in the waiting area.

82.    Ms. Maris was extremely upset, and was trying to tell the nurses to stop. At one point, she was told, through gestures, if she did not stop interfering, she would be removed from the room. But Ms. Maris was not interfering, she knows her own child, and how to cajole him to get what was needed. But, because there was no interpreter provided, no one was able to effectively communicate, and the situation degraded quickly.

83.    The nurses continued to try to force a catheter in WMB, and the child continued to scream and cry. Ms. Maris and WMB's father tried to help hold the child. Finally, WMB's father demanded the nurses stop, because the nurses were unable to get the urine sample even though they relentlessly tried to stick the catheter in the baby.

84.    Upon coaxing of WMB's parents, the child provided a urine sample on his own. Ms. Maris was denied effective communication throughout her child's treatment, and deprived of the ability to protect her son from overzealous medical staff. The failure of Gulf Coast to secure an interpreter created an interaction that needlessly degraded into a very stressful event for the family, and the child.

85.    Upon leaving the hospital, Ms. Maris broke down and cried in the car. She was enraged to have been prevented from communicating with the staff to the detriment of her child. For two (2) weeks after the event, WMB kept telling his mother how scared he was at the hospital, and experienced painful urination.

86.     On approximately October 10, 2018, Hurricane Michael hit the panhandle of Florida.

87.     <u>Fourteenth Visit to Gulf Coast</u>: On November 14, 2018, Ms. Maris took WMB, now three (3) years old, to the ER because he fell on his chin, and his mouth was bleeding badly. Ms. Maris was accompanied by her deaf friend, Amanda Hendrix.

88.     Ms. Maris and Ms. Hendrix requested an interpreter, and the request was denied. Ms. Maris and Ms. Hendrix were told directly the hurricane made the VRI service inoperable, and it had yet to be repaired. It was now more than a month after Hurricane Michael hit the panhandle, and although Gulf Coast knew the VRI <u>could not</u> work, they still refused to provide an onsite ASL interpreter.

89.     Gulf Coast was unable to communicate with Ms. Maris, and her deaf friend. Ms. Hendrix was forced to try to interpret to help Ms. Maris. Ms. Maris was not feeling well herself, and the fighting with Gulf Coast to secure an interpreter exacerbated the situation. An ASL interpreter was never provided during the child's treatment.

90.     During WMB's treatment, Ms. Hendrix encouraged Ms. Maris to be seen since she had not been feeling well, and did not look well.

91.   <u>Fifteenth Visit to Gulf Coast</u>: Once WMB's treatment was done, Ms. Maris stayed to be examined. Ms. Maris had mastoid pain, and had been spitting up blood and coughing.

92.   Once seen, Ms. Maris was immediately admitted to Gulf Coast, requiring hospitalization for three (3) days for Sepsis and Acute Mastoiditis.

93.   For her own treatment, Ms. Maris and Ms. Hendrix renewed the request for an ASL interpreter with the nurses and the doctor. Gulf Coast continued to refuse to provide an interpreter either through VRI, or by way of an onsite interpreter.

94.   Later, Ms. Maris's parents arrived, and renewed the request for an interpreter. Nick Maris provided the names of interpreter agencies that could be called to obtain an interpreter, but Gulf Coast failed to perform the menial task of picking up the phone and calling an ASL interpreter.

95.   The barrier created by Gulf Coast required Ms. Hendrix and Ms. Maris's parents to try to interpret, but it was ineffective. The records reflect information was obtained "through interpretation from the family through lip-reading from the patient." Yet, in the same records, Gulf Coast documented, "She appears to try to lipread, but does so poorly.".

96.   During the three (3) day stay, Ms. Maris underwent blood work, an ECG, chest x-rays, CT of the chest, a maxillofacial CT, and other complicated

procedures. Ms. Maris's father was very upset because the doctors began discussing a mass found in Ms. Maris's head that was potentially cancer. An interpreter was needed.

97.    As Gulf Coast was talking about a possible cancer diagnosis, Ms. Maris's parents were extremely concerned for her, and didn't want her to worry. Her parents made a difficult, but conscious decision not to attempt to interpret any information about a possible cancer diagnosis. Therefore, Ms. Maris was not aware that cancer had been discussed until after being released from the hospital several days later.

98.    Ms. Maris's parents stayed as long as they could each day, knowing Gulf Coast had no intention of securing an interpreter for their daughter. Ms. Maris was not well, and had no energy to keep fighting to get an interpreter. While her parents were not present, Gulf Coast performed some tests, but because Ms. Maris was left without any help to communicate, she did not understand what Gulf Coast was saying about the tests, or why they were done. Ms. Maris was also afraid they would expose her to an MRI, because throughout the treatment MRI's were being discussed. Gulf Coast's failure to accommodate Ms. Maris made a stressful situation untenable.

99.    Throughout her entire three (3) day admission, an ASL interpreter was never provided.

100.   <u>Sixteenth Visit to Gulf Coast</u>: On January 28, 2019, Ms. Maris brought WMB, now three (3) years old, to the ER because he was vomiting with diarrhea, and had stomach pain. Upon arrival, she requested an interpreter, but the request was denied.

101.   It was very difficult to tend to WMB, a sick child, and struggle to communicate. Although the medical records reflect the doctor documented Ms. Maris was "deaf", Gulf Coast, on information and belief, forced Ms. Maris to attempt to communicate by paper and pen. This was not effective, and impossible to do while tending to her sick child.

102.   The child was diagnosed with the flu, and Ms. Maris was very concerned because WMB had not been drinking enough liquids, and was afraid he would become dehydrated. She was unable to ask questions about the time the child would need to recover, and what she should expect next of his condition.

103.   <u>Seventeenth Visit to Gulf Coast</u>: On August 19, 2019, Ms. Maris was brought to the ER by way of an ambulance, after becoming unconscious and passing out on the floor. Ms. Maris was admitted to the hospital for three (3) days, and Gulf Coast failed to provide an interpreter for the full admission. Gulf Coast tried to use VRI, but it did not work, and is quickly abandoned.

104.   During this stay, she had a number of procedures to include chest, hip, and shoulder x-rays, CT of Head/Brain, EEG, and CT scan of neck, but an

interpreter was not provided upon repeated requests by her, her deaf friend, and her parents.

105.   Gulf Coast documents in the medical records that Ms. Maris is "deaf non speaking" and that she is "well known" by the physician screening her. The notes further reflect Gulf Coast's plan to keep her there several days—yet, no one secured an interpreter for the three (3) days she was there.

106.   Although Ms. Maris had been told the VRI would not work because the internet was down, Gulf Coast provided a telemedicine evaluation by way of video by a doctor at another location. When the TV is brought in, the family is confused, and assumed the hospital was going to try VRI again, but, instead, is faced with a physician, believed to be a Neuropsychiatrist, who said they must evaluate Ms. Maris.

107.   There was no interpreter present for this important evaluation, and it was approximately 11:00 p.m. Ms. Maris's deaf friend is forced to interpret because Gulf Coast failed to provide any way to communicate for the important evaluation.

108.   The communication was not effective, because the deaf friend could not hear everything the doctor on the screen was saying, while concurrently trying to interpret what the parents were saying. The deaf friend missed a great deal of

information, and told the doctor he could not hear everything being said by the doctor or by the parents.

109.   It was unclear to Ms. Maris how Gulf Coast had sufficient internet to provide the telemedicine service, a service which they shall charge the patient. Yet, insufficient internet to provide operable VRI, a service which they cannot charge to the patient, but will provide effective communication with the patient. The family was very frustrated, and Ms. Maris was humiliated and felt desperate to talk with the doctors, and answer their questions so they could uncover the nature of her medical condition. Ms. Maris was very ill, and unable to walk, and the frustration of being unable to communicate exacerbated her stress and anxiety level.

110.   Due to the fact that Gulf Coast never secured her an interpreter, and the family's ongoing fears they will try to give Ms. Maris an MRI, her mother slept over every night she was admitted.

111.   Gulf Coast notes in Ms. Maris's medical records, "[patient] would have liked to have a sign language interpreter during her stay but the internet is down since the storm." This entry is made by Gulf Coast almost <u>one (1) year after</u> Hurricane Michael hit the panhandle of Florida.

112.   <u>Eighteenth Visit to Gulf Coast</u>: After being discharged from Gulf Coast, Ms. Maris had not yet fully recovered, she lost strength on the left side of her body, and could not walk without assistance. She was told to go for physical

26

therapy. On information and belief, when the appointment was made, her mother requested an interpreter over the phone.

113.  On August 27, 2019, Ms. Maris attended her physical therapy appointment with her parents and her deaf friend. Upon arrival, they asked when the ASL interpreter would arrive, but no interpreter was secured.

114.  Ms. Maris was using a wheelchair at this time, and she was anxious to undergo the physical evaluation, and was forced to her have her deaf friend interpreter. This was not effective, because the physical therapist had questions about some of the neurological issues Ms. Maris was having. A qualified ASL interpreter was needed.

115.  On approximately August 5, 2019, Ms. Maris was prescribed and fitted with an ambulatory EEG monitor to be worn to monitor seizures and cardiac activity. During that appointment, not held at Gulf Coast, Ms. Maris was provided an ASL interpreter.

116.  Nineteenth Visit to Gulf Coast: On September 19, 2019, Ms. Maris had approximately thirteen (13) seizures, and her family drove her to the ER at Gulf Coast.

117.  Once again, Ms. Maris, and her parents requested interpreters and the requests were denied. Ms. Maris underwent a series of testing to include EKG, blood work, x-rays, and CT of her head/brain, all without the benefit of an ASL

interpreter. Ms. Maris continued to have seizures while at the hospital, and a qualified ASL interpreter was needed.

118.   Her parents attempted to interpret for Ms. Maris, but that was not effective. Ms. Maris was very concerned for her health, and was unable to participate in her own health care decisions due to the failure of Gulf Coast to secure an interpreter.

119.   To properly frame the pattern and practice of exclusion experienced by the Plaintiff, Ms. Maris was denied an interpreter from the time she entered the hospital, when required to provide informed consent, throughout the medical treatment, and when discharged with instructions on what she must do next.

120.   On information and belief, there are at least four (4) ASL interpreter referral agencies that provide interpreters in the Bay County area. These agencies are known to Gulf Coast, because the family, the patient, and her friends were continually providing the information to Gulf Coast in the hopes they would secure an interpreter.

121.   The doctors and the nurses could see the VRI was not working, because it would freeze, which caused the staff to continuously disconnect the VRI, and then abandon the device.

122.   Doctors and nurses who attempted to communicate with Ms. Maris knew of the communication difficulties, because they documented the difficulties

in the medical records. The records also show many of the same medical providers were involved with the pattern and practice of denials of an ASL interpreter. Medical records documented by Gulf Coast report there is a "barrier to communication/learning" because she is deaf.

123.   Gulf Coast also documented her "preferred spoken language" and "preferred written language" is ASL. But still repeatedly fails to accommodate her language and disability needs.

124.   Gulf Coast provided less information to, and received less information from Ms. Maris than typically received from other similarly situated individuals. This stems from their repeated failure to perform the menial task of picking up the phone and calling an ASL interpreter.

125.   The medical records created by Gulf Coast include an affirmative disclosure by the hospital, which Ms. Maris must execute, that acknowledges her legal right to be "treated with respect and dignity and without discrimination or distinction based on age, gender, disability, race, color ancestry…, or any other basis prohibited by law." Yet, they engage in a practice and pattern of violating her federally protected rights over and over again.

126.   After continuous violation of her federally protected rights, Ms. Maris was humiliated and furious over the blatant denial to allow her the benefit of

engaging in an exchange of her medical information. Ms. Maris was continuously denied an onsite interpreter, even when the VRI continued to be inoperable.

127. Ms. Maris was upset, stressed, disappointed, and incensed that she was treated with such disregard, and was not provided meaningful access to her own, and her child's medical care.

128. Ms. Maris shall continue future use of Gulf Coast as it is a hospital covered by her health insurance, and less than ten (10) minutes from her home. Further, Gulf Coast has extensive pediatric services which are needed for WMB.

129. The Plaintiff experienced humiliation, dejection, embarrassment, anger, frustration, and fear as the direct result of Defendants' violation of her federally protected rights.

130. Defendants' actions have caused the Plaintiff distinct, palpable, and perceptible injury. Those injuries include, but are not limited to, those described herein.

## Count I

### Title III of the Americans with Disabilities Act

131. Plaintiff repeats and re-alleges allegations ¶¶ 1-130 in support of her claims.

132. Plaintiff, in this Count, requests declaratory and injunctive relief pursuant to Title III of the ADA.

133.    Defendants are entities covered by Title III of the ADA, 42 U.S.C. § 12101, *et seq,* and places of public accommodation, as defined by Title III of the ADA, 42 U.S.C. § 12181(7), 28 C.F.R. § 36.104.

134.   Defendants' actions and omissions violate their duty to ensure that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.

135.  Defendants failed to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. §§ 12182 (2) (A) (ii).

136.   Defendant failed to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of <u>auxiliary aids and services</u>, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden. 42 U.S.C. § 12182 (2) (A) (iii). (emphasis added).

137.    The term "auxiliary aids and services" includes: "Qualified interpreters on-site or through video remote interpreting (VRI) services, notetakers; real-time computer-aided transcription services; written materials; exchange of written notes…accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303 (b) (1). (emphasis added).

138.    In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F. R. § 36.303 (c) (1) (ii).

139.    A qualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.  28 C.F.R. § 36.104.

140.   A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her. 28 C.F. R. § 36.303 (c) (2).

141.    A public accommodation that chooses to provide qualified interpreters via Video Remote Interpreting [VRI] service shall ensure that it provides— (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-

bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI. 28 C.F.R. § 36.303.

142.   Defendants have engaged in an ongoing pattern and practice of discrimination by continually violating Ms. Maris's federally protected rights.

143.   As a result of Defendants' actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities. In engaging in this unlawful conduct described above, Defendants acted maliciously to damage the rights and dignity of Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below.

## COUNT II

## SECTION 504 OF THE REHABILITATION OF 1973

144.   Plaintiff incorporates and re-alleges paragraphs ¶¶ 1-130 in support of her claims.

145.   Plaintiff in this Count requests declaratory relief, permanent injunctive relief, and monetary damages pursuant to Section 504.

146.   Ms. Maris is deaf, and her disabilities substantially limit major life activities and she is, therefore, considered to be an individual with a disability under Section 504.

147.   Count II is brought against the Defendants as a claim for discrimination against people with disabilities in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, which provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

148.   Defendants are recipients of federal financial assistance including, but not limited to, acceptance of Medicare and Medicaid funds, and are, therefore, subject to the requirements of Section 504. 29 U.S.C. § 794.

149.   Defendants have intentionally discriminated against Plaintiff on the basis of her disabilities, in violation of 29 U.S.C. §794 and its implementing regulations. Such discrimination includes, but is not limited to, failure to provide

auxiliary aids and services, denial of effective communication, and exclusion to services based on disability. 45 C.F.R § 84.52.

150.     A recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care. 45 C.F.R. § 84.52.

151.   Defendants' actions were intentional and with reckless disregard for the rights of the Plaintiff who made repeated affirmative requests to be accommodated, as did her family members.

152.   As a result of Defendants' actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.

153.     Defendants have engaged in an ongoing pattern and practice of discrimination by continually violating Ms. Maris's federally protected rights.

154.   In engaging in this unlawful conduct described above, Defendants acted intentionally and maliciously to damage the rights and dignity of the Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below.

## COUNT III

## SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

155.   Plaintiff incorporates and re-alleges paragraphs ¶¶ 1-130 as it fully set forth herein.

156.   Plaintiff, Ms. Maris, is substantially limited in the major life activities of hearing and speaking. Accordingly, she is an individual with a disability as defined under 29 U.S.C. § 705(20) and 42 U.S.C. § 12102. *See* 42 U.S.C. § 18116; 45 C.F.R. § 92.4.

157.   Defendants are a "healthcare program or activity," receiving federal financial assistance, including Medicaid and Medicare reimbursements. They are, therefore, a covered entity under 42 U.S.C. § 18116.

158.   Section 1557 of the Patient Protection and Affordable Care Act states "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]". 42 U.S.C. § 18116(a).

159.   A public entity shall give "primary consideration" to the requested accommodation by individuals with disabilities. 45 C.F.R. § 92.202. S*ee* 28 C.F.R § 35.160 (b) (1) (2).

160.   A qualified interpreter for an individual with a disability means an interpreter who via a remote interpreting service or an on-site appearance:

(i) Adheres to generally accepted interpreter ethics principles, including client confidentiality; and (ii) is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, terminology and phraseology. 45 C.F.R. § 92.4.

161.    Defendants have engaged in an ongoing pattern and practice of discrimination by continually violating Ms. Maris's federally protected rights.

156.   Defendants have intentionally discriminated against the Plaintiff solely on the basis of her disabilities, in violation of Section 1557 the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

157.    As a result of Defendants' actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.  In engaging in this unlawful conduct Defendants acted intentionally and maliciously to damage the rights and dignity of the Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below

## Relief Requested

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A.    The Court assume jurisdiction;

B.    Issue a declaratory judgment that Defendants' policies, procedures,

and practices have subjected Plaintiff to discrimination in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Affordable Care Act;

C.   Enjoin Defendants from any policy, procedure, or practice that will deny deaf  individuals, such as the Plaintiff, equal access to an opportunity to participate in, and benefit from, Defendants' services, or that denies Plaintiff effective communication with Defendants;

D.   Order Defendants to train its employees about Plaintiff's rights, and the rights of individuals who are deaf, about the requirements to provide auxiliary aids and services, including providing qualified sign language interpreters;

E.   Award compensatory damages to the Plaintiff for violation of Section 504 and the Affordable Care Act;

F.   Award reasonable attorney's fees, and expenses and costs of suit; and

G.   Grant such other relief as the Court may deem equitable and just under the circumstances.

DATE:  May 1, 2020.

Respectfully submitted,

MORGAN AND MORGAN

*/s/ Sharon Caserta*
Sharon Caserta, Esq.

Florida Bar No.: 0023117
Morgan & Morgan
Deaf /Disability Rights
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 245-1121 (Videophone)
(904) 361-0078 (Voice)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com
*Trial Counsel for Plaintiff*